Thomas E. Lubnau
LUBNAU LAW OFFICE, PC
PO Box 1028
Gillette, Wyoming 82717
Phone: (307) 682-1313
Fax: (307) 682-9340
Email: tom@etseq.com

Philip A. Nicholas
NICHOLAS & TANGEMAN, LLC
PO Box 928
Laramie, Wyoming
Phone: (307) 742-7140
Fax: (307) 742-7160
Email: nicholas@wyolegal.com

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| ROBERT ALLEN HARVEY and ELAINE HARVEY,<br>　　Plaintiffs,<br>vs.<br>HALLIBURTON ENERGY SERVICES, INC.,<br>　　Defendant. | CIVIL ACTION<br>No. 19-cv-27 |

## DECLARATION OF ALLEN HARVEY

Robert Allen Harvey declares as follows:

1. I am over the age of eighteen with personal knowledge of all the matters stated in this affidavit.

2. I am a resident and citizen of Lovell, Big Horn County, Wyoming.

3. In 1994, Bentonite Performance Minerals, LLC recruited me to set up the lab in the bentonite plant located near Lovell, Wyoming, which had been mothballed for several years.

4. BPM hired me to organize the testing lab and work as its Quality Assurance/Quality Control Supervisor for the bentonite production facility.

5. I was responsible for ensuring that the BPM lab met the American Petroleum Institute (API) standards and ensured that all lab personnel followed procedures so as to maintain its API license with every audit.

6. At the time I was hired, and throughout my employment with BPM, I was not asked to sign an agreement of employment.

7. I was never provided or asked to sign an employee manual, employee handbook, or other agreement containing any work requirements.

8. I understood that I was an employee at will.

9. In 1998/1999 Halliburton Energy Services, Inc. ("Halliburton") acquired Bentonite Performance Minerals, LLC.

10. After Halliburton's acquisition of the BPM facility, my pay checks came from Halliburton.

11. I was never required to fill out a job application for employment with Halliburton.  I simply continued my relationship with BPM without change or modification.

12. At the time I was hired, and throughout my employment with Halliburton, I was not asked to sign an agreement of employment.

13. Halliburton didn't ask me to sign an employee manual, employee handbook, or other agreement containing any work requirements.

14. Halliburton did not offer, nor did it require me to sign, an employment agreement with the company.

15. Approximately 15 years after I began working for Halliburton, in March of 2014, I was diagnosed with Rheumatoid and Psoriatic Arthritis

16.     Because Halliburton's insurance program refused to pay for the Remicade treatments, and because I had lost my job, I was forced to discontinue the Remicade treatments. Because of that, my health has declined more rapidly leading to knee replacements and further disability.

17.     Rheumatoid and Psoriatic Arthritis are autoimmune diseases causing chronic inflammation of my joints.

18.     As a result of my Rheumatoid Arthritis, I was required to undergo two surgeries on my feet while employed with Halliburton.

19.     For each surgery, I was required to exercise time off from Halliburton under the Family Medical Leave Act.

20.     I was prescribed Remicade Infusion treatments by my treating physician for my Rheumatoid and Psoriatic Arthritis.

21.     My medical insurance provided by Halliburton pre-approved my Remicade treatments.

22.     My first Remicade treatment was on February 1, 2016. That treatment started the load-up phase.

23.     My second Remicade treatment was scheduled for February 16, 2016.

24.     My third Remicade treatment was scheduled for March 14, 2016 and completed the load-up phase; treatments were scheduled to be every 7 to 8 weeks thereafter.

25.     The cost of each Remicade treatment was $13,646 each.

26.     I am aware of other Halliburton Employees who receive Remicade treatments paid for by Halliburton's medical insurance program.

27. On March 16, 2016, I was fired by Halliburton. At the time, I was serving as the Lovell Plant's Quality Assurance/Quality Control Supervisor. I had served in this role at the BPM Plant since October 3, 1994

28. After I was terminated Halliburton and its medical administrator advised me that "pre-approval" doesn't mean "pre-authorization" and together they refused to cover the prescribed Remicade for the treatment of my Rheumatoid and Psoriatic Arthritis.

29. Halliburton claimed that they were laying me off with two other men due to a reduction in force at the Lovell Plant.

30. Halliburton replaced me with a younger man whom I had hired and trained.

31. The three individuals "laid off" were all over the age of 60.

32. At the time I was laid off, I was 61 years of age, with 42 years of experience in the bentonite industry.

33. Within a short time after my termination, and in the same calendar year I was terminated, Halliburton hired at least four new employees all younger than 60 years of age.

34. When I was terminated, I met with the human resource director of Halliburton and asked for my employment file. I was told that the file belonged to Halliburton, and that I could only have training documents that I signed. I was then provided the documents attached as **Exhibit A**. To my current recollection, the documents attached as Exhibit A are the only documents that I signed relevant to my employment with Halliburton.

35. The Human Resources person did not tell me, nor did he offer to me, that Halliburton had a dispute resolution policy in place.

36. On or about April 7, 2016, I timely filed a Charge of Discrimination with the State of Wyoming, Department of Workforce Services – Labor Standards, Wyoming Fair Employment Program (FEP) charging Halliburton with unlawful discriminatory employment practices in my termination because of my age and disability.

37. In July or August of 2016, we were asked to meet without lawyers to medicate with Cheri Doaks who was an employee of Wyoming Workforce Services. Halliburton employees walked out of that mediation without mention of the DPR or arbitration.

38. On October 27, 2017, I attended along with my wife and our counsel Tom Lubnau and Phil Nicholas in a second mediation with Halliburton conducted by the Department of Workforce Services in Casper, Wyoming. During that mediation it was related to me for the very first time that Halliburton had an arbitration agreement. It was suggested to me that I should accept a small settlement because I had no right to a jury trial.

39. Because I had no idea what Halliburton was talking about, my attorney Tom Lubnau asked for a copy of any arbitration agreement from Halliburton's attorneys. That letter is dated October 30, 2017 and is attached as **Exhibit B**.

40. On or about December 11, 2017, the Department of Workforce Services rendered the determination attached as **Exhibit C** finding that : "[E]vidence obtained during the investigation to date establishes a violation of federal and state statutes and based on a preponderance of the evidence, I hereby issue a finding of probable cause to believe discrimination occurred."

41. Also accompanying the Notice of Determination was a proposed Conciliation Agreement suggesting a settlement amount determined by the State of Wyoming's Department of Workforce Services which is attached as **Exhibit D**.

42. On December 19, 2017 Halliburton's counsel for the first time responded to Mr. Tom Lubnau's request for the dispute resolution process in the email attached as **Exhibit E**. My wife and I searched diligently and could find no evidence that we had ever received the 2015 documents attached to that email. I have no recollection of ever seeing the documents attached.

43. My wife and I agreed to accept the terms of the State of Wyoming's Conciliation Agreement. However, we were told that Halliburton rejected the Conciliation Agreement and wanted to purse a resolution under their dispute resolution process which still had not been provided to us. See the email provided by Workforce Services dated February 26, 2018 attached as **Exhibit G.**

44. As a result of Halliburton's unwillingness to conciliate under the Department of Workforce Services' Conciliation Agreement, the Department issued its final determination on March 1, 2018 attached as **Exhibit H**.

45. My wife and I have searched our records to see if we ever received any of the documents attached to Ms. Miner's Declaration supplied in this matter. We did find in our records a copy of the December, 2012, documents attached to Ms. Miner's Declaration at Exhibit A-5.

46. I have no recollection of receiving Exhibit A-5 or any similar document described as "Plan and Rules."

47. I have no recollection reading Exhibit A-5 or any similar document described as "Plan and Rules."

48. The Exhibit A-5 cover letter provides:

> As a reminder, each employee of any Halliburton company in the US ... has agreed (along with the Company itself) that all disputes will be resolved utilizing this DRP. **This is a condition of your employment, and by continuing (or accepting) employment upon receipt of this notification, you are renewing your agreement to be bound by the DRP**....

49. I had never agreed to, nor was I asked to agree to accept the terms of the dispute resolution plan or any plan like that as part of my employment with Halliburton.

50. No one from Halliburton ever told me that they had a "Dispute Resolution Plan". Nor was I informed of such when I was terminated.

51. No one from Halliburton ever discussed with me, nor did they advise me that I should read, the Dispute Resolution Plan.

52. No one from Halliburton ever told me that my employment was conditioned upon my acceptance of the Dispute Resolution Plan.

53. I have never agreed to the terms of the Dispute Resolution Plan.

54. I worked for Halliburton eighteen years and during that time I was never told by anyone that I should not come back to work unless I had read, reviewed or agreed to an unsolicited mailing sent to my home.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 25 day of February, 2019.

Robert Allen Harvey