Thomas E. Lubnau
LUBNAU LAW OFFICE, PC
PO Box 1028
Gillette, Wyoming 82717
Phone: (307) 682-1313
Fax: (307) 682-9340
Email: tom@etseq.com

Philip A. Nicholas
NICHOLAS & TANGEMAN, LLC
PO Box 928
Laramie, Wyoming
Phone: (307) 742-7140
Fax: (307) 742-7160
Email: nicholas@wyolegal.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | | |
|---|---|---|
| ROBERT ALLEN HARVEY and ELAINE HARVEY, | ) ) | |
| Plaintiffs, | ) ) | **CIVIL ACTION** |
| vs. | ) ) | **NO. 19-cv-27** |
| | ) | |
| HALLIBURTON ENERGY SERVICES, INC., | ) ) | |
| Defendant. | ) | |

---

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DISMISS, OR IN THE ALTERNATIVE, TO STAY THE PROCEEDINGS

---

Plaintiffs Robert Allen Harvey and Elaine Harvey file this Brief in Opposition to *Defendant's Motion to Compel Arbitration and Dismiss, or in the Alternative, to Stay the Proceedings.*

Defendant Halliburton, Inc ("Halliburton") seeks to compel arbitration under a unilaterally imposed Dispute Resolution Plan" ("DRP").  They seek to impose the DRP upon Mr. Harvey, who was an at will employee, by showing that they mailed the plan to his personal residence well after his employment began.  Halliburton concedes it did not provide the plan to Mr. Harvey at the time of his initial employment, and that it has no evidence that

Mr. Harvey read or agreed to the DRP.

The Court should deny Halliburton's request because there was and is no agreement between the parties to enforce.  Nor does Halliburton show that it provided adequate consideration to unilaterally amend Mr. Harvey's at will employment relationship with the Company.

## I.      RELEVANT FACTUAL BACKGROUND.

The following facts are taken from the Declaration of Mr. Allen Harvey filed with Plaintiffs' Opposition to Motion to Compel Arbitration. [Mr. Harvey's Declaration is filed as Document No. 12, and the Exhibits referred to in his Declaration are filed at Document 11-1.]

Plaintiff Robert Allen Harvey was recruited by Bentonite Performance Materials, LLC ("BPM") to work at its Lovell, Wyoming bentonite plant in 1994.  Mr. Harvey was hired as an employee at will.  He was not required to sign an employment agreement, or employee handbook.  He was recruited to setup a new laboratory necessary to restart the bentonite plant.  [Doc. 12, ¶¶ 1-8.]

In 1998/1999 Halliburton, Inc ("Halliburton") acquired BPM.  Upon Halliburton's acquisition of the BPM plant, Mr. Harvey became a Halliburton employee.  He was not asked to complete an application for work with Halliburton.  Mr. Harvey was not required to sign a new employment agreement, employee handbook, or any other acknowledgment that his at will employment would be subject to any conditions. [Doc. 12, ¶¶ 9-14.]

In 2004, approximately 15 years after he began working for Halliburton, Mr. Harvey was diagnosed with Rheumatoid and Psoriatic Arthritis.  Because of that disease, he was

required to undergo two surgeries on his feet requiring that he take time off from work with Halliburton using leave mandated pursuant to the Family Medical Leave Act. As his condition worsened, he was prescribed Remicade Infusion Therapy to arrest the progress of the disease. [Doc. 12, ¶¶ 15-23.]

Mr. Harvey was terminated on March 16, 2016, a few days after he was beginning the "load-up" phase for Remicade Infusion Treatments. Although other Halliburton employees were provided coverage for Remicade therapy, Halliburton's self-funded insurance program declined payment of Mr. Harvey's Remicade therapy immediately after he was terminated. Unable to afford the cost of the Remicade treatments because he had lost his job, Mr. Harvey was forced o stop the therapy which has caused a more rapid and permanent decline in his health. [Doc. 12, ¶¶ 24-28.]

Halliburton claims they laid Mr. Harvey off along with two other men due to a reduction-in -force required for the Lovell Plant. The three individuals "laid off" at the Lovell Plant were all over the age of 60. At the time he was laid off, Mr. Harvey was 61 years of age with 42 years of experience in the bentonite industry. He served as the Bentonite Plant's Quality Assurance/Quality Control Supervisor. He had occupied that position since October 3, 1994. Halliburton later replaced Mr. Harvey with a younger person hired and trained by him. And, in the months that followed his termination, the Lovell Plant hired four new employees under the age of 61. [Doc. 12, ¶¶ 29-33.]

On or about April 7, 2016, Mr. Harvey timely filed a Charge of Discrimination with the State of Wyoming, Department of Workforce Services – Labor Standards, Wyoming Fair Employment Program ("WFEP"). Mr. Harvey charged Halliburton with unlawful

discriminatory employment practices based on his age and disability.  Pursuant to WFEP procedures, Mr. and Mrs. Harvey participated in a conciliation process in Cheyenne, Wyoming without legal counsel in July/August of 2016.  Halliburton's representatives walked out of that mediation, failing to mention the existence of an arbitration agreement. [Doc. 12, ¶¶ 36-38.]

The Harveys participated in a second mediation effort with their legal counsel with WFEP mediators on October 27, 2017.  The facts show that Halliburton had little interest in, and refused to participate in good faith in the WFEP mediations.  [Doc. 12, ¶¶ 36-43.]

When the parties failed to reach an agreement, Halliburton for the first time claimed that Mr. Harvey was bound to a dispute resolution process.  Unaware of such a policy, Mr. Harvey's counsel, Mr. Tom Lubnau, requested a copy of the claimed arbitration process on October 30, 2017.  [Doc. 12, ¶ 42; Doc. 11-5.]

On or about December 11, 2017, the Wyoming Department of Workforce Services issued a Determination Letter with a proposed Conciliation Agreement.  [Doc. 12, ¶¶ 43; Doc. 11-3 & 11-4] & ]Workforce Services  found probable cause to support Mr. Harvey's claim.  It proposed a Conciliation Agreement with a proposed settlement amount for the resolution of this dispute.  The Harvey's accepted the Conciliation Agreement terms.  Halliburton rejected that mediation effort.

On December 19, 2017, Halliburton's counsel for the first time responded to Mr. Tom Lubnau's October request for a copy of the dispute resolution process in an email.  The email attached to it a December 2014 letter from Halliburton's Chairman and CEO to its employees describing a dispute resolution plan.  That same Halliburton communication is

attached to Halliburton's supporting documents as Exhibit A-6 [Doc. 7-7]. Attached to the December 14, 2014 letter are plan documents with a copyright make of 2015. Mr. Harvey and his wife searched diligently and could not find any evidence that they had ever received the 2014 or 2015 documents attached to the December 19, 2017 email. Mr. Harvey had no recollection of ever seeing the documents attached. [Doc. 12, ¶¶ 46-54. ]

When Halliburton refused to participate in the WFEC's conciliation process, the WFEC issued its final determination on March 1, 2018, nearly two years after Mr. Harvey's wrongful termination. It is now nearly three years since his unlawful termination.

Halliburton supplied with its Motion to Compel Arbitration additional correspondence it claims were sent to Mr. Harvey at his home. (See, Declaration of Melinda Miner. [Doc. 7]) Mr. Harvey searched for those documents and confirms that he located in his storage cabinet the document dated 2012 found at Halliburton Exhibit A-5. [Doc. 7-3, pages 1-41]

Mr. Harvey has no recollection of receiving or reading any of the Documents attached to Ms. Miner's Declaration. No one from Halliburton ever told him that they had a "Dispute Resolution Plan." Nor was he told he should read the 2012 document sent to his home, which was simply placed in his files without review. No one advised him of the existence of such a plan when he was terminated. [Doc. 12, ¶¶ 46-54. ]

This brief assumes that the December 2012 cover letter and attached "Plan and Rules" found at Defendants Exhibit A-5 were received by Mr. Harvey. [Doc. 7-6] Those documents provide, *inter alia*, as follows:

> As a reminder, each employee of any Halliburton company in the US

… has agreed (along with the Company itself) that all disputes will be resolved utilizing this DRP. **This is a condition of your employment, and by continuing (or accepting) employment upon receipt of this notification, you are renewing your agreement to be bound by the DRP….**

> Cover page, at Exhibit A-5, Page 1 [Doc. 7-6].

We developed the Dispute Resolution Program in 1993 to meet the needs of employees and the Company for resolving workplace disputes.

> Program Overview, at Exhibit A-5, Page 2 [Doc. 7-6].

This Plan contractually modifies the "at will" employment relationship between the Company and its Employees, but only to the extent expressly stated in this Plan….

> Plan and Rules, at Exhibit A-5, Page 13 [Doc. 7-6].

This Plan may be terminated by the Sponsor [Halliburton] at any time by giving at least 30 days' notice of termination to current Employees…

> Plan and Rules, at Exhibit A-5, Page 19 [Doc. 7-6].

The original effective date of this Plan was June 15, 1993. In effective as amended shall be thirty (30) days following notice of the most recent amendments to current employees.

> Plan and Rules, at Exhibit A-5, Page 21 [Doc. 7-6].

Mr. Harvey was not required to complete a job application when Halliburton took over the BPM plant. His employment flowed seamlessly from BPM to Halliburton. He was never required to sign any document agreeing to any such plan upon his employment with Halliburton. Mr. Harvey was not provided a copy of, was not aware of, and never agreed to the DRP or any other arbitration process. He was an at will employee without restriction.

No one from Halliburton ever mentioned or discussed the DRP with him. Nor did anyone advise him that he should read a Dispute Resolution Plan. No one from Halliburton told him that his employment was conditioned upon my acceptance of the Dispute

Resolution Plan.

Mr. Harvey worked for Halliburton eighteen years and during that time he was never told by anyone that he should not come back to work unless he had read, reviewed or agreed to an unsolicited mailing sent to his home.

## II.   ARGUMENT.

### A.   Summary of Argument.

Defendant Halliburton's brief assumes that the parties had a valid arbitration agreement and then cites only to authority in its favor, ignoring all authority opposite its position.  The facts of many of the cases cited by Defendant are immediately distinguishable because the employee signed the agreement at issue, or the state law where the dispute arose was substantively different than the law of Wyoming.

Plaintiff readily concedes that other states have statutory and case law governing employment relationship which is different that the law of Wyoming.  What is clear, however, is that Wyoming law applies to the determination of whether the parties had an enforceable contract to arbitrate.

Plaintiff submits that Wyoming case law dictates the opposite result suggested by Halliburton.  Several courts have addressed case law similar to Wyoming.  Those cases confirm that when there is no contract between to arbitrate, a court may not impose arbitration on the parties.

Further, and independently, Halliburton could not amend Mr. Harvey's at will employment status by imposing an arbitration requirement without providing new consideration.  Halliburton never offered Mr. Harvey consideration for changing his at will

employment status.  Finally, under Wyoming law, an offer of continued employment cannot constitute consideration for changing an at will relationship.

Halliburton's unsolicited and unilateral mailing of a Dispute Resolution Plan, which it reserved the right to amend and terminate could not, under Wyoming case law, modify Mr. Harvey's at will employment status with Halliburton.

> **B.    Standard of Review and Application of State Law to FAA.**

The question of whether or not arbitration can properly be compelled is a question of law, which courts review de novo. *Kindred Healthcare Operating, Inc. v. Boyd*, 2017 WY 122, ¶ 12, 403 P.3d 1014, 1018–19 (Wyo. 2017); *Morrow v. Hallmark Cards, Inc.*, 273 S.W.3d 15, 21 (Mo. Ct. App. 2008); *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 856 (Mo. banc 2006).

The Wyoming Supreme Court summarized the proper contract analysis for determining whether parties have entered into an enforceable arbitration agreement as follows:

> Both the Federal Arbitration Act and the Uniform Arbitration Act adopted by the Wyoming legislature make arbitration agreements "valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.S. § 2; Wyo. Stat. Ann. § 1-36-103 (LexisNexis 2017). Therefore, when deciding whether an arbitration agreement is enforceable, courts apply state law principles governing the formation of contracts. *Fox v. Tanner*, 2004 WY 157, ¶ 18, 101 P.3d 939, 944 (Wyo. 2004) (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995)). When language is clear and unambiguous, the interpretation and construction of contracts is a matter of law for the courts. *Thorkildsen v. Belden*, 2011 WY 26, ¶ 8, 247 P.3d 60, 62 (Wyo. 2011) (citing *Cheek v. Jackson Wax Museum, Inc.*, 2009 WY 151, ¶ 12, 220 P.3d 1288, 1290 (Wyo. 2009)). We review questions of law de novo without giving any deference to the district court's determinations. *Id.* The question of whether a

> contract is unconscionable is also one of law. *Roussalis v. Wyoming Medical Center, Inc.,* 4 P.3d 209, 245 (Wyo. 2000).

*Kindred Healthcare Operating, Inc.*, at 1018.

The Missouri Court of Appeals, Western District, summarized the need for a valid underlying contract imposing arbitration between the parties as follows:

> As we noted at the outset, "[a]rbitration is a matter of contract, and a party cannot be required to arbitrate a dispute that it has not agreed to arbitrate." *Dunn Indus. Group,* 112 S.W.3d at 435; *see also* 6 C.J.S. *Arbitration* sec. 1 (2004). Absent a contract to arbitrate, no party has a unilateral right to impose on another party a requirement of arbitration as the sole procedure for dispute resolution. *Dunn Indus. Group,* 112 S.W.3d at 427–28; *see, e.g., Bailey v. Fed. Nat'l Mortgage Ass'n,* 209 F.3d 740, 745 (D.C.Cir.2000). It is a firmly established principle that parties can be compelled to arbitrate against their will only pursuant to an agreement whereby they have *agreed* to arbitrate claims. *AT & T Techs., Inc. v. Commc'n Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *see also Circuit City Stores, Inc. v. Ahmed,* 283 F.3d 1198, 1200 (9th Cir.2002); *Bailey,* 209 F.3d at 745….

*Morro*, at 21–22.   Relying on contract principles, the Wyoming Supreme Court has determined that job security can be inferred from an employment relationship such that "unilateral contract principles" require that an offer be accepted and consideration exchanged to modify the at will employment relationship.  *Brodie v. Gen. Chem. Corp.*, 934 P.2d 1263, 1268 (Wyo. 1997).  The Court in *Brodie*, rejected the notion that an employee's continued employment sufficed as acceptance and consideration because, in essence, the employee is merely performing duties under the preexisting contract.  The Court answered the following certified question in the affirmative:

> Does the principle approved in *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 219 (Wyo.1994), that "a promise by an

> employer or an employee under a subsisting contract to do more
> or take less than that contract requires is invalid unless the other
> party gives or promises to give something capable of serving as
> consideration" apply in employee handbook contract cases?

*Id.* That principle applies in this matter as well. An employment contract may not be

unilaterally modified without consideration absent a valid, prior contract reserving such right

to the employer.

### C. HALLIBURTON'S MAILING OF THE DRP DID NOT CREATE AN ENFORCEABLE CONTRACT UNDER WYOMING LAW.

Arbitration agreements are by their very nature a matter of contract. *American National*

*Bank of Denver v. Cheyenne Housing Authority,* Wyo., 562 P.2d 1017 (1977). *Panhandle E. Pipe*

*Line Co. v. Smith*, 637 P.2d 1020, 1024 (Wyo. 1981).

The Wyoming Supreme Court has determined that the waiver of access to the courts

through an agreement to arbitrate may not be based upon implied consent, but only on a

clear and unmistakable consent to arbitrate. *Fox v. Tanner*, 2004 WY 157, ¶ 20, 101 P.3d 939,

944 (Wyo. 2004). The *Fox* Court emphasized that "***Courts should not assume that the***

***parties agreed to arbitrate arbitrability unless there is "clear and unmistakable"***

***evidence that they did so." Id,*** at 945.

The elements of any contract are: offer, acceptance, and consideration. The

establishment of the existence of these elements leads courts to conclude that "mutual

assent" has occurred. *Matter of Estate of McCormick*, 926 P.2d at 362. The Wyoming Supreme

Court described the requirement of mutual assent as follows:

> It is from the confluence of these factors, rather than from the
> subjective intent of the parties, that courts find mutual assent:

> In Wyoming, we examine the objective manifestations of the parties' contractual intent to determine whether a contract was formed. *McDonald v. Mobil Coal Producing, Inc., 820 P.2d 986, 990 (Wyo.1991). "Under the 'objective theory' of contr*act formation, contractual obligation is imposed not on the basis of the subjective intent of the parties, but rather upon the outward manifestations of a party's assent sufficient to create reasonable reliance by the other party." *Id.* A party's intention will be held to be what a reasonable person in the other party's shoes would conclude his manifestations to mean. *Shrum v. Zeltwanger*, 559 P.2d 1384, 1387 (Wyo.1977).

> *Givens v. Fowler*, 984 P.2d 1092, 1095 (Wyo.1999). A contract can be formed where one party lacks subjective intent, but nevertheless proceeds as if there were a contract. *McDonald v. Mobil Coal Producing, Inc.,* 820 P.2d 986, 990 (Wyo.1991). " 'The conduct of a party may manifest assent even though he does not in fact assent. In such cases a resulting contract may be voidable because of fraud, duress, mistake, or other invalidating cause.' " Id. (quoting Restatement (Second) of Contracts § 19 (1979)).

*Dobson v. Portrait Homes, Inc.*, 2005 WY 95, ¶ 12, 117 P.3d 1200, 1205 (Wyo. 2005); 17 C.J.S. Contracts § 34 (In order for a contract to be formed, both parties must mutually assent to its terms, and both parties must manifest assent to the particular terms of the contract.).

In this case, there was no mutual assent.  The Halliburton DRP was clearly intended to be implemented through an initial employment agreement.  This is the reason for the Cover Page language stating that "[a]s a reminder, each employee of any Halliburton company in the US … **has agreed** (along with the Company itself) that all disputes will be resolved utilizing this DRP."  [Emphasis added.]  While it may have been Halliburton's practice to have new employees agree that their employment at will status was subject to the DRP at the beginning of their employment

relationship, that did not happen in the case of Mr. Harvey.  Mr. Harvey did not previously make such an agreement; his employment was not conditioned upon his approval of the DRP, any other arbitration agreement, or Halliburton's right to make changes to his at will relationship.

### 1.   UNDER WYOMING LAW, THE HALLIBURTON LETTER WAS NOT AN OFFER.

The DRP information supplied by Halliburton attached to the Declaration of Ms. Melinda Miner does not constitute an offer.  An "offer" is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his or her assent to that bargain is invited.  17 C.J.S. <u>Contracts</u> § 39;  § 4:3.<u>The classical model: Manifestation of assent by offer and acceptance</u>, 1 Williston on Contracts § 4:3 (4th ed.)(Ordinarily a proposal or offer is necessary.).

The material mailed by Halliburton was unsolicited and did not invite any action by Mr. Harvey.  In fact, it was not read by Mr. Harvey.  It did not constitute an offer under Wyoming law.

### 2.   UNDER WYOMING LAW, THERE IS NO EVIDENCE THAT MR. HARVEY ACCEPTED THE DRP.

Wyoming case law requires manifestations of a parties' contractual assent for the formation of a contact.  *McDonald v. Mobil Coal Producing, Inc.,* 820 P.2d 986, 990 (Wyo.1991).  There is no evidence that Mr. Harvey accepted the terms of the DRP.  Acceptance must be manifested either by word or act, since without this there cannot be an agreement. 17 C.J.S. <u>Contracts</u> § 48.

Two Wyoming cases addressing amendments to at will employment relied upon by

Defendant are readily distinguishable on this finding:  *Kindred Healthcare Operating, Inc. v. Boyd*, 2017 WY 122,  403 P.3d 1014 and *Preston v. Marathon Oil*, 277 P.3d 81, 85-88 (Wyo 2012).  In both of those cases, the Plaintiff's assent was proven through written agreements signed by them or by their representatives.

In  *Preston v. Marathon Oil*, Plaintiff Yale Preston signed an assignment of inventions discovered by him during his employment in favor of his employer Marathon.  Mr. Preston had begun work thirty days preceding the execution of this paperwork.  The Wyoming Supreme Court ruled that new consideration was not required to support the signed conditional assignment agreement.  The Court's analysis relied on Mr. Preston's prior execution of the assignment.

In *Kindred Healthcare Operating, Inc. v. Boyd*, the alternative dispute resolution agreement at issue was signed by plaintiff patient's representative under a general power of attorney. The Court in that matter ruled that "[m]utual assent between contracting parties is necessary for the formation of a contract." *Kindred Healthcare Operating, Inc.*, at 1024.  While the Court in *Kindred Healthcare* indicated that an ADR agreement executed before medical care was provided was sufficient consideration to support the signed contract, it did not address the issues of whether an employment relationship could be changed without new consideration and a signed agreement of the parties.  What is clear, is that for the *Kindred Healthcare* finding to apply, there must be a mutually signed agreement.

In this case, Mr. Harvey was not asked to sign any documents and was unaware of the DRP.  He did not read, nor was he asked to read, the DRP material.  The evidence shows that Mr. Harvey continued to work as an employee at will without knowledge of the DRP.

And, it shows that he never consented to a change in his employment status.

### 3. UNDER WYOMING LAW, HALLIBURTON PROVIDED NO CONSIDERATION FOR THE DRP.

Halliburton's DRP material admits:

> This Plan contractually modifies the "at will" employment relationship between the Company and its Employees, but only to the extent expressly stated in this Plan…. (Plan and Rules, at Exhibit A-5, Page 13. [Doc. 7-6])

Halliburton failed to provide adequate consideration for a modification of the at will contract between it and Mr. Harvey.

In the case of an at-will employment relationship, Wyoming case law requires sufficient, separate and contemporaneous consideration to support an ancillary covenant not to compete entered into during the term of employment. "This view recognizes the increasing criticism of the at-will relationship, the usually unequal bargaining power of the parties, and the reality that the employee rarely "bargains for" continued employment in exchange for a potentially onerous restraint on his or her ability to earn a living." *Hopper v. All Pet Animal Clinic*, 861 P.2d 531, 541 (Wyo. 1993).

In cases where Wyoming Courts have evaluated sufficient, separate and contemporaneous consideration to support an ancillary promise, they have inquired to such matters as the promisor's right to earn a living, promotions, pay raises, special training, or employment benefits or advantages to the employee. *Hopper v. All Pet Animal Clinic*, 861 P.2d 531, 541 (Wyo. 1993) citing *Ridley v. Krout*, 63 Wyo. 252, 260, 180 P.2d 124, 125-26 (1947); *Stevenson v. Parsons,* 96 N.C.App. 93, 384 S.E.2d 291, 293 (1989); *Records Center, Inc. v. Comprehensive Management, Inc.,*363 Pa.Super. 79, 525 A.2d 433, 435 (1987); *Cukjati v.*

*Burkett,* 772 S.W.2d 215, 218 (Tex.App. 1989). *See* Or. Rev. Stat. § 653.295 (1991). Continued at-will employment, however, has been rejected as sufficient legal consideration to support an ancillary covenant not to compete entered into after the original employment contract was formed. *Id.* The only exception is found in the case of assignments of inventions in *Preston v. Marathon Oil.* While the Wyoming Supreme Court suggested that reduced consideration is required when addressing assignments of inventor rights in *Preston v. Marathon Oil*, that finding was dependent upon a mutually signed contract.

In *Kindred Healthcare Operating, Inc v. Boyd,* the Wyoming Supreme ruled that if the claimed consideration was a promise of legal forbearance subject to unilateral modification or revocation, then, the promises would be deemed illusory causing the contract to be unsupported by adequate consideration. *Kindred Healthcare Operating, Inc.* 2017 WY 122, ¶¶ 43-44, 403 P.3d at 1025. Such are the facts in this matter where Halliburton has reserved the right to unilaterally amend and/or terminate the DRP.

### D. STATES WITH LAWS SIMILAR TO THOSE OF WYOMING HAVE FOUND UNDER SIMILAR FACTS UNILATERAL IMPOSITION OF ARBITRATION REQUIREMENTS TO BE UNENFORCEABLE.

Applying Missouri law, the Missouri Court of Appeals refused to enforce an arbitration requirement in *Morrow v. Hallmark Cards, Inc.*, 273 S.W.3d 15, 21 (Mo. Ct. App. 2008), concluding that "[a]rbitration is a matter of contract, and a party cannot be required to arbitrate a dispute that it has not agreed to arbitrate." Similar to the facts in this case, in *Morrow* the employee plaintiff was hired by Hallmark in 1982, and Hallmark adopted its DRP policy in 2002. Hallmark's DRP contained similar language that the employee's continued employment would be deemed to create consented to the plan. The Court in *Morrow*

observed "[w]ith regard to contracts, on the other hand, signatures remain a common, though not exclusive, method of demonstrating agreement." *Id*, at 22-23. The Court found that the employee was not expected to express agreement, but was expected simply to acquiesce in the new requirement in order to keep working. That was deemed insufficient to create an agreement.

Hawaii courts have ruled that an arbitration provision not contained in a document that was made available to the employee at the time of his enrollment in a health plan was insufficient to place the employee on notice of the arbitration provision. *Siopes v. Kaiser Found. Health Plan, Inc.*, 130 Haw. 437, 452, 312 P.3d 869, 884 (2013), as corrected (Sept. 26, 2013). That court concluded "[i]t is an elementary rule of contract law that there must be mutual assent or a meeting of the minds on all essential elements or terms in order to create a binding contract." The record in this case does not indicate that Michael "was informed of the existence of the arbitration provision, let alone that he would be bound by it." Accordingly, it cannot be said that the requirement of mutual assent to arbitration is satisfied, and Michael cannot be compelled to arbitrate his claims against Kaiser, barring any alternative basis for requiring arbitration."

The New Mexico Court of Appeals determined that Defendant-Employer's argument that in exchange for Plaintiff Employee's promise to submit her disputes to binding arbitration it allowed her to retain her job was without merit. Plaintiff was an at-will employee before she signed the Arbitration Agreement and she remained an at-will employee after she signed the Arbitration Agreement. The implied promise of continued at-will employment placed no constraints on Defendant's future conduct; its decision to continue

Plaintiff's at-will employment was entirely discretionary.   The Court determined that the agreement failed for lack of consideration.   *Piano v. Premier Distrib. Co.*, 2005-NMCA-018, ¶ 8, 137 N.M. 57, 60, 107 P.3d 11, 14.   See also, *C.lark v. Unitedhealth Group*, 2018 U.S. Dist. LEXIS 98360 (Because an employer can terminate an at-will employment relationship at any time, including immediately, an offer of at-will employment strikes this Court as a text-book illusory promise. It binds neither party to any future conduct. The Restatement (Second) of Contrasts instructs: "[w]here the apparent assurance of performance is illusory, it is not consideration for a return promise." Restatement (Second) of Contracts §77, cmt. A, illus. 2 (1981 ).)

### E. CASES CITED BY DEFENDANT ARE DISTINGUISHABLE FROM THE FACTS OR LAW OF THIS CASE.

Defendant cites to *Nesbitt v. FCNH, Inc.*, 811 F.3d 371, 376 (10th Cir. 2016), a case arising out of the District of Colorado for the proposition that an arbitration agreement is enforceable if it is (1) written, (2) part of a contract or transaction involving interstate commerce, and (3) valid under general principles of contract.  *Nesbitt* makes it clear that there must be a valid arbitration agreement under the general principles of Colorado state law in order for the FAA to apply.   In *Nesbitt,* the plaintiff student massage therapist signed an arbitration agreement.  The existence of an agreement was not in dispute.  The Court refused to enforce the agreement because it unfairly shifted costs of the arbitration to the student.

Defendants cite to three cases to support the proposition that "it is well-established that the FAA does not require signatures of the parties to be enforceable."  All three are not only distinguishable, but they support Plaintiffs' position in this matter.  The first case,

*Bellman v. i3Carbon*, LLC, 563 F. App'x 608, 614 (10th Cir. 2014), is a case arising out of Colorado.  The proposition cited by Defendant is followed by the Court's conclusion that "[h]owever, while a signature is not always required, the parties must still have entered into a valid arbitration agreement under state law."  In that matter, the Court determined that none of the documents to which the plaintiff was a party evinced an agreement by Plaintiff to arbitrate its claims.

Defendant's second case, *Med. Dev. Corp. v. Indus. Molding Corp.*, 479 F.2d 345, 348 (10th Cir. 1973), is cited for the proposition that an arbitration agreement need not be in writing.  In *Med. Dev. Corp.*, the defendant provided a purchase order confirmation of an earlier oral purchase.  Among the terms found on the reverse side of the purchase order confirmation was an arbitration clause.  The appellate court affirmed the trial court's refusal to order arbitration where it "found lack of awareness of the arbitration clause by the plaintiff."  The facts of that case support Plaintiff's arguments that lack of awareness of an arbitration clause shows a lack of agreement to arbitrate.

The third case cited by Defendant is *Howard v. Ferrellgas Partners*, L.P., 92 F. Supp. 3d 1115, 1123–24 (D. Kan. 2015).  In that case, Kansas state law was applied to determine if a Master Agreement supplied by a propane supplier before it supplied propane to its customer which contained an arbitration agreement was enforceable.  The Court found that under Kansas law, "[i]n an action based on contract, the plaintiff bears the burden of proving the existence of the contract alleged in the petition."  And that "[t]he terms of an oral contract and the consent of the parties may be proven by the parties' acts and by the attending circumstances, as well as by the words that the parties employed."  The evidence on this issue

was very clear: plaintiff did indeed request and accept delivery of propane, services, and equipment from defendant after defendant mailed the Master Agreement.  Those are not the facts of this case.

Defendants cite to a quote in *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 476 (10th Cir. 2006) arguing that an employee's continued employment manifests her assent to an employer's proposed modification of an at-will employment.  They argue that under this authority, Mr. Harvey expressed his assent to be bound by the DRP by not quitting his job.  The quoted matter does not support that conclusion.  In *Hardin* the employee discussed the DRP with her supervisor shortly after receiving the DRP materials.  The employee unequivocally refused to consent to the DRP, responding that she would not quit and that she rejected the DRP.  Her supervisor replied that despite her statements to the contrary, her continued employment with First Cash would manifest her acceptance. There was no further communication and the employee never signed the agreement.  The Court looked to Oklahoma law on the topic, finding no precedent.  The Court determined that "[h]ere, First Cash, in the explicit language of the Agreement, made an offer to Hardin, which stated that her continued employment after March 1 would manifest her assent to the DRP. Hardin, in equally explicit language, made a counteroffer and informed her supervisor that she refused to abide by those terms. First Cash immediately rejected this counteroffer when Hardin's supervisor reiterated that her continued employment would serve as her acceptance."  The Court found that under these facts the supervisor's explicit rejection of the employee's counteroffer, and the employee's continued employment constituted the employee's assent to the DRP.  First, this is not the law of Wyoming.  Second, even if the Wyoming Supreme

Court would accept this analysis in an at will relationship, the facts of this case do not reflect any such offer or acceptance.

Texas cases relied upon by Defendant should not be considered persuasive.  Under Texas law, a party asserting a change to an at-will employment contract must prove two things: (1) notice of the change, and (2) acceptance of the change.  *In re Halliburton Co.*, 80 S.W.3d 566, 568 (Tex. 2002).  That is not the law of Wyoming.

### F.  LOSS OF CONSORTIUM CLAIMS DO NOT FALL WITHIN THE SCOPE OF THE DRP.

Mrs. Harvey's loss of consortium is a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the ADA.  She has sustained and will continue to suffer a loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, and the loss of the enjoyment of other relations and other incidents incumbent with the husband and wife relationship.  Certainly, Mrs. Harvey's claims have a causal relationship to Mr. Harvey's claims but that does not provide a mechanism to abrogate the right to access the judicial forum of a person wholly unconnected to the DRP contract.

Mrs. Harvey was not an employee of Haliburton.  Haliburton never attempted to bind Mrs. Harvey in an arbitration agreement.  Nowhere in Haliburton's DRP does it attempt to put employees on notice that claims of family members not employed by Haliburton shall be absorbed by the DRP agreement.

Haliburton cites a three-part inquiry that establishes mechanisms to sweep collateral claims into arbitration agreements that are broadly defined.  This does not implicates

derivative claims of third parties, but rather serves to evaluate whether Defendants can absorb collateral claims of properly bound parties into an arbitration agreement.

Although *McCauley v. Haliburton Energy Services., Inc.* 161 Fed Appx. 760 (10th Cir., 2005) does not provide guiding precedent for the applicability of the DRP to the employee because the parties admitted McCauley formed a contract with Haliburton as an employee, the case provides on-point guidance as to the applicability of the DRP to the loss of consortium claim filed by McCauley's spouse.   The *McCauley* court analyzed that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Citations omitted.   McCauley at* 766.   The Court held that "neither McCauley Insulation nor the McCauley family was a party to the HDRP; nor are their negligence and loss of consortium claims grounded in Rodney's status as an employee of Haliburton.  We disagree with Halliburton that its Dispute Resolution Plan could be read to include them."   *Id.*

In this matter, the contractual relationship between Allen Harvey and Haliburton is disputed.  For all of the reasons set forth in this opposition, Allen Harvey did not have a valid arbitration agreement with Haliburton.   If Allen Harvey did not have a valid arbitration agreement with Haliburton, there is no way Elaine Harvey could be bound to an agreement.

Even if the court were to find an arbitration agreement existed between Allen Harvey and Haliburton, there is no contractual relationship between Elaine Harvey and Haliburton which would justify including her claims in an arbitration.

**III.    CONCLUSION.**

For all of the foregoing reasons, Defendant's *Motion to Compel Arbitration and Dismiss,*

*or in the alternative, to Stay the Proceedings* should be denied.  Halliburton should be ordered to answer the Complaint and this matter should proceed to a jury trial.

Dated: February 26, 2019.

____/s/ Philip A. Nicholas_____
Philip A. Nicholas, No. 5-1785
Meggan J. Nicholas, No. 7-4856
NICHOLAS & TANGEMAN, LLC
170 North Fifth Street
Laramie, WY 82073-0928
Tel: (307) 742-7140 - Fax: (307) 742-7160

Thomas E. Lubnau
LUBNAU LAW OFFICE, PC
PO Box 1028
Gillette, Wyoming 82717
Phone: (307) 682-1313
Fax: (307) 682-9340

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 26, 2018 I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

_____/s/ Philip A. Nicholas_____